**DIRECT MEDIA CORPORATION,**
**Plaintiff,**

v.

**CAMDEN TELEPHONE AND TELE-**
**GRAPH COMPANY, INC., and TDS**
**Telecom, Inc., Defendants.**

**No. CV296–108.**

United States District Court,
S.D. Georgia,
Brunswick Division.

Dec. 2, 1997.

Joseph E. East, Joseph E. East, P.C., Waycross, GA, for Direct Media Corp., plaintiffs.

George M. Rountree, Rountree & Souther, Brunswick, GA, Peyton Samuel Hawes, Jr., John C. Butters, Atlanta, GA, for Camden Telephone and Telegraph Company, Inc., TDS Telecom, Inc.

James B. Gilbert, Jr., Gilbert, Harrell, Gilbert Et., Al., Brunswick, GA, for Consolidated Communications Directories, Inc.

### ORDER

ALAIMO, District Judge.

Plaintiff, Direct Media Corporation ("Direct Media"), brings this action seeking injunctive and monetary relief for alleged violations of the Sherman Act, the 1996 Telecommunications Act, and the Georgia Fair Trade and Practices Act. Defendants,

Camden Telephone and Telegraph Company, Inc. ("Camden Telephone"), and TDS Telecom, Inc. ("TDS"), are corporations engaged in the business of providing local telephone service. Currently before the Court is Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated below, Defendants' motion for summary judgment will be **DENIED IN PART** and **GRANTED IN PART**. All further proceedings in this matter will be **STAYED**.

## FACTS

Plaintiff, Direct Media, is a Georgia corporation whose sole shareholder is Gerry Screven ("Screven"). Direct Media is the independent publisher of a telephone advertising directory named the "Peach Pages." The Peach Pages resembles the familiar Yellow Pages. Screven published his first directory in Waycross, Georgia in 1986. In 1993, Screven published the Kings Bay/Camden directory, which is the subject matter of this litigation.

Defendant, Camden Telephone, is located in St. Mary's, Georgia and provides the local telephone service for the Camden County area. Camden Telephone also publishes the white and yellow pages for the area. Defendant, TDS, is an Iowa corporation that owns fifty-one percent of Camden Telephone and manages Camden Telephone. The remaining forty-nine percent of Camden Telephone is owned by local shareholders. Consolidated Communications Directories, Inc. ("CCD")[1] entered into a contract with Camden Telephone in 1992, wherein CCD agreed to solicit advertisers for Camden Telephone's yellow pages and to publish its directory. CCD pays Camden Telephone seventy percent of the revenue generated. Camden Telephone maintains an updated subscriber database and provides that database to CCD for the publication of the white pages.

In 1992, Direct Media prepared to publish a directory for the Camden County area. The sales staff solicited advertising in the area. An independent publisher, such as Direct Media, can obtain the subscriber information for the white pages either by purchasing the information from the local provider or by simply copying the information from the telephone "book on the street." In 1993, Screven informed Marion Sharp ("Sharp"), the general manager of Camden Telephone, that he intended to publish a directory. They discussed the price for the subscriber information. Sharp contends that he told Screven he would sell the information for two dollars a listing. Screven contends that he was told the cost would be three dollars a listing. Screven decided not to purchase the information and published the directory in May 1993 by copying the Camden Telephone listings from the existing white pages. In October 1994, Direct Media again published the directory by copying the Camden Telephone listings. Neither of these directories made a profit.

In February 1996, Screven sent a letter to the local phone companies in all the markets where he published directories, including Camden Telephone, and demanded the current listings of service subscribers at a reasonable cost.[2] On March 19, 1996, Screven sent another letter to Camden Telephone complaining of the failure to respond. Screven then was referred to Jerry Masters at TDS, who was responsible for the directory publishing activities of all companies owned by TDS. On March 25, 1996, Sharp gave Screven a quote of forty-eight cents per listing. At the same time, Cindy Overbeck ("Overbeck"), an employee of CCD, ordered a copy of the Camden Telephone list produced by Reed Technologies for Direct Me-

---

**1.** CCD was named as a defendant in this action, but Direct Media settled its claims with CCD prior to the Court's consideration of this motion.

**2.** Defendants contend that Screven was motivated to bring this lawsuit as a result of a memorandum he received in February 1996 from the Association of Directory Publishers ("ADP"). The memorandum advised ADP members of the passage of the Telecommunications Act of 1996 and suggested that all independent publishers should send a letter to the local phone company requesting telephone listing information with a copy of the pertinent section of the Telecommunications Act of 1996. The memorandum also advised that if the publisher is unhappy with the phone company's response, it may sue the phone company in a United States District Court to recover damages and attorneys' fees.

dia. Overbeck also sent Direct Media a license agreement in which TDS and Camden Telephone agreed to provide the listing information to Direct Media on certain terms and conditions. Screven did not sign the agreement and, instead, demanded the information for four cents a listing by the close of business of March 27, 1996. The information was never provided. On July 2, 1996, Direct Media filed its complaint alleging violation of the Sherman Act, the 1996 Telecommunications Act and the Georgia Fair Trade and Practices Act.

## DISCUSSION

### I. *Summary Judgment*

Summary judgment requires the movant to establish the absence of genuine issues of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Lordmann Enterprises, Inc. v. Equicor, Inc.*, 32 F.3d 1529, 1532 (11th Cir.1994), *cert. denied*, 516 U.S. 930, 116 S.Ct. 335, 133 L.Ed.2d 234 (1995). After the movant meets this burden, "the non-moving party must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Co.*, 32 F.3d 520, 524 (11th Cir.1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The non-moving party to a summary judgment motion only must make this showing after the moving party has satisfied its burden. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

The Court should consider the pleadings, depositions, and affidavits in the case before reaching its decision, Fed.R.Civ.P. 56(c), and all reasonable inferences will be made in favor of the non-movant. *Griesel v. Hamlin*, 963 F.2d 338, 341 (11th Cir.1992). Additionally, a "court need not permit a case to go to a jury ... when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir.1996). Furthermore, when the evidence is only circumstantial, summary judgment may be granted when a court "concludes that no reasonable jury may infer from the assumed facts the conclusions upon which the non-movant's claim rests." *Id.*

### II. *Federal Antitrust Violations under the Sherman Act*

#### A. Conspiracy under 15 U.S.C.A. § 1

A plaintiff seeking damages for violation of Section 1 of the Sherman Act must establish that the defendants entered into an illegal conspiracy that caused a cognizable injury. *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538, 551–52 (1986). A conspiracy under Section 1 of the Sherman Act requires the concerted action of at least two independent business entities. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628, 641. Generally, the jury determines whether a conspiracy existed. *Boczar v. Manatee Hospitals & Health Sys., Inc.*, 993 F.2d 1514, 1517 (11th Cir.1993).

When the alleged co-conspirators are related business entities, the plaintiff must be able to identify the individual interests of the conspirators in order to establish an actionable conspiracy. *Tiftarea Shopper, Inc. v. Georgia Shopper, Inc.*, 786 F.2d 1115, 1117–18 (11th Cir.1986); *United States v. Hartley*, 678 F.2d 961, 971 (11th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983); *H & B Equip. Co. v. International Harvester Co.*, 577 F.2d 239, 244 (5th Cir.1978). As a general rule, a corporation cannot conspire, for purposes of the Sherman Act, either with its agents or subsidiaries. *Copperweld*, 467 U.S. at 771, 104 S.Ct. at 2741–42, 81 L.Ed.2d at 643; *Bolt v. Halifax Hosp. Med. Ctr.*, 851 F.2d 1273, 1280 (11th Cir.), *vacated for reh'g en banc*, 861 F.2d 1233 (1988), *reinstated in part*, 874 F.2d 755 (1989). Unilateral activity of a corporation is not prohibited by Section 1 of the Sherman Act. *Bolt*, 851 F.2d at 1280. To determine whether the conduct is unilateral or a concerted effort by conspirators, courts will consider a variety of factors. These factors include the interests and objectives of each company, the significant decision makers, and who will receive the benefit of the activity. *Copperweld*, 467 U.S. at 769, 104 S.Ct. at 2740, 81 L.Ed.2d at 642.

■ Direct Media contends that Defendants and CCD conspired to deny Plaintiff timely access to the telephone subscriber list. (Compl.¶ 47). Direct Media also contends that Defendants' proposed rates and terms for the list were discriminatory, unreasonable, and did not include the needed regular updates. (*Id.*) Defendants, however, contend that there was no conspiracy as a matter of law for two reasons. First, Defendants argue that Camden Telephone could not conspire with TDS because TDS owned a majority interest in Camden Telephone. Second, Defendants contend that no conspiracy could exist with CCD because of the agency relationship among the parties.[3] Plaintiff failed to rebut these contentions.

■ First, TDS does manage and own fifty-one percent of Camden Telephone. Plaintiff has not presented any evidence that Defendants had any distinct business interests. There is no evidence in the record that Defendants are separate business entities that could conspire. Second, Plaintiff contends that Defendants stated in their Brief in Support of Summary Judgment that CCD is independent and, therefore, a conspiracy could occur between CCD and Defendants. However, the briefs submitted in support of motions are not evidence to be considered by the Court in resolving a summary judgment motion. *See* Fed R. Civ. P. 56(e). Plaintiff's evidence, which was provided to show the existence of the conspiracy, consists of the contract between Camden Telephone and CCD and a sales flyer used by CCD. This evidence merely establishes that the parties have a common interest in producing a quality and profitable telephone directory. An internal agreement among related corporate entities to further a single goal does not create an actionable conspiracy for purposes of the Sherman Act. *See Copperweld,* 467 U.S. at 769, 104 S.Ct. at 2740–41, 81 L.Ed.2d at 642.

Plaintiff failed to provide sufficient evidence to suggest that Defendants were separate business entities with independent business interests. Plaintiff also has failed to provide any evidence that a conspiracy existed among these related corporate parties. Therefore, as a matter of law, Defendants and CCD are unable to conspire for purposes of Section 1 of the Sherman Act, and Defendants' Motion for Summary Judgment will be granted as to this allegation.

**B. Monopoly or Attempted Monopoly under 15 U.S.C.A. § 2**

Direct Media raised two claims under Section 2 of the Sherman Act: monopoly and attempted monopoly. Direct Media contends that Defendants violated Section 2 by abusing an essential facility, the telephone subscriber list, and by using their monopoly of the local phone service to leverage into another market. Specifically, Direct Media contends that Defendants have a monopoly in the provision of local phone service and are using that monopoly to establish or attempt to establish a monopoly in the telephone advertising directories market. (Compl.¶ 30). Direct Media contends that Defendants have unreasonably restrained trade and commerce in the provision of business classified advertising in Camden County, hindered Plaintiff's ability to compete with Defendants, established artificially high advertising prices, and denied directory enhancements and advanced features to serve and assist those in the distribution area better. (Compl.¶¶ 59, 60).

■ Monopoly under Section 2 of the Sherman Act is comprised of two elements: (1) possession of monopoly power in the relevant market, and (2) willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778, 786 (1966); *T. Harris Young & Assoc., Inc. v. Marquette Electronics, Inc.,* 931 F.2d 816, 823 (11th Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991); *Great Western Directories, Inc. v. Southwestern Bell Tel. Co.,* 63 F.3d 1378, 1384 (5th Cir.1995), *superseded on other grounds,* 74 F.3d 613 (1996).

---

**3.** All alleged conspirators need not be defendants in an antitrust action. *Hennessey v. National Collegiate Athletic Ass'n,* 564 F.2d 1136, 1147 (5th Cir.1977).

Monopoly power is "the power to raise prices to supra-competitive levels, power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out." *US Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 994 (11th Cir.1993) (quoting *American Key Corp. v. Cole Nat'l Corp.,* 762 F.2d 1569, 1581 (11th Cir.1985)). Several factors are considered when determining monopoly power: market share, affirmative actions to exclude actual or potential competitors, strength of competitors, profit levels, and potential for entry. *Eastman Kodak Co. v. Image Technical Serv., Inc.,* 504 U.S. 451, 481–83, 112 S.Ct. 2072, 2090, 119 L.Ed.2d 265, 293 (1992); *US Anchor Mfg.,* 7 F.3d at 994; *Great Western Directories,* 63 F.3d at 1384. There is no requirement in antitrust law for the plaintiff to show that the defendant's conduct eliminated all competition. *Great Western Directories,* 63 F.3d at 1386. The plaintiff only must show that the defendant acted unjustly and handicapped its competitors. *Id.*

■ Defendants do not dispute that they have a monopoly in the provision of local phone service. Additionally, there is evidence that Defendant, Camden Telephone, has over ninety percent of the advertising revenue in the Camden County area. It is true that this evidence is not conclusive that a monopoly exists, but it, at least, raises a genuine issue of material fact that a monopoly exists.

■ However, the plaintiff not only must establish the existence of a monopoly, but also must demonstrate that the defendant "willfully" acquired or maintained its monopoly power through competitively undesirable means. *Great Western Directories,* 63 F.3d at 1384–85. Competitively undesirable means do not include the exclusionary effects inherent in free competition. *Id.* at 1385. Rather, competitively undesirable means includes only those means which are substantially enhanced or made possible by the possession and exploitation of monopoly power. *Id.* A company is guilty of monopoly

leveraging if it uses market power in one market to gain a market share in another market other than by competitive means. *Key Enter. of Del., Inc. v. Venice Hosp.,* 919 F.2d 1550, 1556 (11th Cir.1990), *vacated for reh'g en banc,* 979 F.2d 806 (1992), *appeal dismissed,* 9 F.3d 893 (1993), *cert. denied, Sammett Corp. v. Key Enter. of Del., Inc.,* 511 U.S. 1126, 114 S.Ct. 2132, 128 L.Ed.2d 863 (1994).

Defendants contend that its high market share and the fact that Direct Media was unable to make a profit in the area is insufficient evidence to find that Defendants have employed competitively undesirable means. Defendants offer explanations for Plaintiff's failure which include the poor quality of Plaintiff's directory, Plaintiff's ineffective sales efforts, and low advertiser confidence in Plaintiff's product. These reasons, however, do not establish that there is no genuine dispute that Defendants' anticompetitive actions could be responsible for the failure of Plaintiff's directory.[4] Instead, Plaintiff presents evidence that Defendants' price per listing is higher than that charged by other local telephone service providers. Defendants have quoted prices per listing ranging from forty-eight cents to three dollars, while Bell-South, another local phone provider, charges four cents per listing. The Fifth Circuit in *Great Western Directories* found that high prices for directory listings was evidence of anticompetitive practices. 63 F.3d at 1386.

Additionally, Defendants argue that Plaintiff could copy the subscriber list from the telephone "book on the street" and, therefore, the subscriber list is not an essential facility which Defendants could manipulate to prevent competition. Plaintiff, however, presents evidence that, at least, raises a genuine issue of material fact. One of Defendants' local managers agrees that Camden County is a quickly growing area and, as a result, the listings in the telephone book are quickly outdated. (Sharp Dep. p. 40). In this situation, updated subscriber lists are especially important. If Defendants, who have exclusive access to that list, will not

---

4. Defendants foster the impression among the local advertisers that Plaintiff's directory is inferior. CCD uses the fact that Direct Media's directory may contain out of date information as a sales technique when soliciting advertisers.

release the information on reasonable terms for a reasonable price, a jury might conclude that Defendants are "willfully" maintaining their monopoly. Subscriber listings are vital to the directory publishing industry and that "without sharing this updated information with competing directory publishers, telephone companies are able to leverage their monopoly position in the telephone service area into the competitive directory market." *Great Western Directories*, 63 F.3d at 1386 (quoting Aff. Mr. Parsons, former Yellow Pages President). If Plaintiff is hindered from purchasing an accurate subscriber list, its directory would be of a lesser quality and advertisers would lose interest.

■ An attempted monopoly under Section 2 of the Sherman Act consists of three elements: (1) the defendant has engaged in predatory or anticompetitive conduct, (2) specific intent to acquire monopoly power in the relevant market, and (3) a dangerous probability of actually achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247, 257 (1993); *Retina Assoc., P.A. v. Southern Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1384 (11th Cir. 1997). "Predatory or anticompetitive conduct is that which unfairly tends to be exclusionary or tends to destroy competition." *Great Western Directories*, 63 F.3d at 1385. Few anticompetitive practices are obvious on their face. Typically, "[t]he circumstances surrounding a particular business practice give strong clues as to what those who employ the practice hope to accomplish by it. *Id.* at 1386. The probability that an actual monopoly will result is usually determined by considering the defendant's market share or the actual detrimental effect on competition." *Levine v. Central Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1552 (11th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 75, 136 L.Ed.2d 34 (1996); *Id.*

Considering the evidence in the light most favorable to Direct Media, there is sufficient evidence to raise a genuine issue of material fact that Defendants engaged in anticompetitive conduct. Defendants control over ninety percent of the telephone advertising directory market. The high price of the listings, as compared to other local telephone providers, and the restrictive terms of the licensing agreement support an inference that the decisions were made to decrease the presence and competition of independent directory publishers. *See Great Western Directories*, 63 F.3d at 1387. Additionally, the language found in the contract between CCD and Defendants highlights that Defendants intend to prevent the growth and development of independent publishers.

Defendants have failed to present sufficient evidence for the Court to find as a matter of law that there was no monopoly or attempted monopoly in this situation and, therefore, summary judgment would not be appropriate on this claim.

### III. *Telecommunications Act of 1996*

■ In January 1996, Congress passed the Telecommunications Act of 1996 which requires local telephone companies to provide independent publishers local telephone listings at "a reasonable price." 47 U.S.C.A. § 222(e) (Supp.1996). Defendants contend that the primary jurisdiction doctrine requires the Court to defer the resolution of this claim to the expertise of the Federal Communications Commission ("FCC"). Plaintiff requests that the Court should exercise its discretion and retain jurisdiction over the claim.

■ The primary jurisdiction doctrine requires that in

cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight

gained through experience, and by more flexible procedure.

*Far East Conference v. United States,* 342 U.S. 570, 574–75, 72 S.Ct. 492, 494–95, 96 L.Ed. 576, 582 (1952). If the case involves questions that are beyond the Court's competence or that should be resolved by an agency in order to promote uniformity, the Court should stay the proceedings and refer the case to the appropriate agency. *United States v. Open Bulk Carriers, Ltd.,* 465 F.Supp. 159, 163 (S.D.Ga.1979).

The question of what constitutes a reasonable rate for telephone directory listings under Section 222(e) should be resolved by the FCC. The FCC has more knowledge and expertise in this area than the Court, and uniformity in this determination is important. No court has addressed the issue of what constitutes a reasonable rate under the recently amended Section 222(e). However, courts have stayed litigation and referred issues of determining reasonable rates under the Communications Act to the FCC. *See In re Long Distance Telecomm. Litig.,* 831 F.2d 627, 631 (6th Cir.1987). In *In re Long Distance Telecomm. Litig.,* the court held that the language of 47 U.S.C.A. § 201(b) expressed Congress' intent that the FCC should make determinations of reasonable rates under the Communications Act. *Id.* Section 201(b) indicates that "[t]he Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provision of this chapter." Since the recently amended Section 222(e) is found in the chapter governed by Section 201(b), the FCC may prescribe the necessary rules and regulations to carry it out.

This claim falls within the "primary jurisdiction" of the FCC, and the Court will defer to the Commission's expertise. Since the determination of what constitutes a reasonable rate under Section 222(e) has not yet been made, the Court will stay further pro-

ceedings until the FCC has the opportunity to address this issue.

## IV. *Georgia Fair Trade and Practices Act*

■ Defendants argue that Plaintiff's counsel has withdrawn this count, even though no formal pleading was filed. Plaintiff's counsel, Mr. East, stated that the count had been withdrawn during the deposition of Dr. Seaman. Defendants' counsel then did not ask any further questions relating to that count. This argument does not support the entry of summary judgment in favor of Defendants. In essence, Defendants are requesting that the Court involuntarily dismiss Plaintiff's claim.[5]

■ Involuntary dismissal is governed by Federal Rule of Civil Procedure 41(b) which states in relevant part: "For failure of the plaintiff to prosecute or comply with these rules or any order of court, a defendant may move for dismissal of an action or any claim against the defendant." This rule allows the Court to manage its docket, enforce its orders, and effectuate the prompt resolution of litigation. *Goforth v. Owens,* 766 F.2d 1533, 1535 (11th Cir.1985). This sanction, though, is imposed only in extreme circumstances. *Id.* If the defendant has suffered prejudice or delay, the sanction is often warranted. *Id.* The legal standard for determining whether involuntary dismissal is appropriate is whether there is a clear record of delay or willful contempt, and a finding that a lesser sanction would not suffice. *Id.*

■ In this case, there is no evidence that the Court should dismiss Plaintiff's claim pursuant to Federal Rule of Civil Procedure 41(b). There is no evidence that a sanction as serious as involuntary dismissal is warranted when there is no evidence of any delay, contempt, or disregard of the Court's orders by Plaintiff. Even though Plaintiff's counsel indicated in a deposition that the Count would be withdrawn, that is insufficient for the Court to dismiss the claim with-

---

5. This is not voluntary dismissal under Federal Rule of Civil Procedure 41(a) because Plaintiff has not made such a motion as required by the rule, nor have the parties stipulated to the dismissal in writing. *See Negron v. City of Miami Beach,* 113 F.3d 1563, 1571 (11th Cir.1997). A motion for voluntary dismissal is generally granted unless there is evidence that the defendant will suffer specific prejudice. *Fisher v. Puerto Rico Marine Mgmt.,* 940 F.2d 1502, 1502 (11th Cir.1991)

out an appropriate motion from Plaintiff.[6] Defendants have failed to show any significant prejudice as a result of any reliance of the statement made by Plaintiff's counsel during the deposition. Therefore, the Court will not enter summary judgment or dismiss this count.

## CONCLUSION

Having considered fully the positions asserted by the parties in this matter, the Court concludes that motion should be and is hereby **DENIED IN PART** and **GRANTED IN PART.** All further proceedings are **STAYED** until the Federal Communications Commission has an opportunity to consider the issue raised. The parties are given sixty days to present this matter to the Federal Communications Commission for adjudication. The Clerk is directed to enter the appropriate judgment.

---

6. Plaintiff should have responded to this argument raised by Defendants. Under the Local Rules for the United States District Court of the Southern District of Georgia, "Failure to reply shall indicate that there is no opposition to a motion." Local Rule 7.5 (1996). The Court could assume that Plaintiff's silence is consent to the dismissal. However, in the absence of a motion, the Court will not dismiss the Count.