**LIVINGSTON DOWNS RACING ASSOCIATION, INC.**

v.

**JEFFERSON DOWNS CORPORATION,**
et al.

United National Insurance Corporation, et al.

v.

Jefferson Downs Corporation, et al.

Nos. CIV.A.96–3430–D–M1, CIV.A.97–18–D–M1.

United States District Court, M.D. Louisiana.

Oct. 24, 2002.

Vance A Gibbs, Charles S. McCowan, Jr., Bradley Charles Myers, Shannan Sweeney Rieger, Troy J. Charpentier, James P. Dor, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, LA, for Jefferson Downs corp., Fair Grounds Corp., Inc., Finish Line Management, Inc., Bryan Krantz, Marie Krantz, Committee to Control Gambling, Peter Henry, George Boudreaux.

Michael A. Patterson, Daniel D. Holliday, III, Long Law Firm, LLP, Baton Rouge, LA, Andrew C. Engolio, Baton Rouge, LA, for Larry Bankston.

Craig J. Fontenot, Smith and Davis, Baton Rouge, LA, for General Agents Ins. co. of America, Inc.

## *RULING & ORDER*

BRADY, District Judge.

This matter is before the Court on motions for summary judgment filed by Jefferson Downs Corporation (doc. 635), The Committee to Control Gambling (doc. 629), Marie Krantz (doc. 618), Larry Bankston (doc. 650), Peter Henry (doc. 632), and George Boudreaux (doc. 626). Each request for summary judgment asserts several bases, many of them now irrelevant. Pending also is a motion for partial summary judgment on the issue of damages (doc. 665) and several motions *in limine* (docs. 622, 624, 658, and 660) filed by Fair Grounds, Finish Line, Bryan Krantz, Marie Krantz, the Committee to Control Gambling, Peter Henry, and George Boudreaux. The Court considers whether the plaintiff, Livingston Downs Racing Association, Inc. has sufficiently supported its claims under (1) § 1964(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and (2) § 1 of the Sherman Act. Finding that the supporting evidence is insufficient for the action to survive summary judgment, the Court grants the

Provino C. Mosca, Mosca & Mosca, New Orleans, LA, Darlene Sansone Ransome, Baton Rouge, LA, J. Marvin Montgomery Baton Rouge, LA, David T. Ralston, Jr., Steven C. Lambert, Roderick B. Williams, Ransome Law Firm, Baton rouge, LA, for Livingston Downs Racing Ass'n, Inc.

motions of all these defendants with respect to all claims under RICO and § 1 of the Sherman Act. Since the Court determines that Livingston Downs may have stated a claim under § 2 of the Sherman Act, this ruling does not terminate the case entirely. Consequently, the other motions remain. The Court denies the motion for partial summary judgment and the motions *in limine*, though the remaining defendants may urge these motions again once the § 2 claims, if any, have been developed.

## FACTUAL BACKGROUND

This case involves an alleged sweeping plan, implicating all the original defendants, to keep Livingston Downs out of the market for live horse racing and off-track betting ("OTB") in a portion of southeastern Louisiana. Livingston Downs alleges that Defendants proposed to effectuate their plan by tying it up in layers of government process. The Court presented the full details of the alleged scheme in its ruling of August 13, 2001 (doc. 557).[1] The Court adopts that version for the purpose of addressing these motions. Some additional facts are, however, needed for a complete disposition.

### A. The Claims

A brief overview of the plan will provide some context. Live horse racing and OTB are heavily regulated markets in Louisiana, with very few government-approved participants. Marie and Bryan Krantz ("the Krantzes") are two of these participants. Until October of 1992, the Krantzes operated Jefferson Downs racetrack in Jefferson Parish, Louisiana. Sometime in 1990, they purchased a controlling interest in the Fair Grounds racetrack, which operates within one hundred miles of Jefferson Downs. These two racetracks were, at all relevant times, the only two in the area. The Krantzes also own Finish Line Management which itself operated OTB parlors associated with Jefferson Downs. Later, these parlors transferred to Fair Grounds when the Krantzes closed Jefferson Downs.

When Jefferson Downs stopped holding races, Al Ransome, owner of Livingston Downs saw a business opportunity. Because these gambling enterprises are highly regulated, to make a go of his proposed new racetrack in Livingston Parish, Ransome had to obtain the approval of the Louisiana State Racing Commission as well as the voters of Livingston Parish.

Allegedly, the Krantzes saw in the regulatory process their own business opportunity, namely to delay and perhaps frustrate a possible competitor by playing fast and loose with the procedures and institutions of the regulatory process. Livingston Downs claims that the Krantzes engaged in the following anticompetitive behavior: (1) they aggressively lobbied the state legislature and racing commission for favorable actions; (2) they attempted to delay the licensing process with the racing commission; (3) they filed frivolous lawsuits through corporations within their control and other straw-plaintiffs, without regard to the merits of their claims; and (4) they ran, via a freshly-minted alter-ego, an aggressive ad campaign aimed at convincing voters to reject a new live horse racing operation. These endeavors, Livingston Downs claims, imposed costs in the form of legal fees and also ultimately succeeded in frustrating Livingston Downs' entry into the market, which caused it to lose expected profits.

---

1. Published as *Livingston Downs Racing Ass'n v. Jefferson Downs, Corp.*, 192 F.Supp.2d 519 (M.D.La.2001).

## B. The Parties

Any full understanding of this case requires a cast of characters. When Livingston Downs originally filed suit in this Court, it named seventeen defendants.[2] They are:

(1) Jefferson Downs Corporation;

(2) Fair Grounds Corporation;

(3) Finish Line Management Corporation;

(4) The Committee to Control Gambling, Inc.;

(5) Bryan Krantz;

(6) Marie Krantz;

(7) Karen Thomas;

(8) Terence Lee Odom;

(9) Peter Henry;

(10) George Boudreaux;

(11) Larry Bankston;

(12) Oscar Tolmas;

(13) Albert Stall;

(14) Payton Covington;

(15) Melinda Tucker;

(16) Ben Thomas; and

(17) W.C. Littleton.

Livingston Downs retains claims against nine of these original defendants. Livingston Downs agreed to dismiss Oscar Tolmas, Albert Stall, Payton Covington, Melinda Tucker, Ben Thomas, and W.C. Littleton pursuant to a settlement.[3] The Court dismissed them on November 21, 1996 (doc. 50). Livingston Downs submitted a motion to dismiss Karen Thomas and Terrence Lee Odom on August 18, 1998 (doc. 249). The Court dismissed these defendants on October 22, 1998 (doc. 277). Remaining in the action are Bryan and Marie Krantz, four incorporated entities that they control in some degree, two people—Peter Henry and George Boudreaux—whom the Krantzes employed at the relevant times through three of these corporations, and Larry Bankston, attorney for the Krantzes and their corporations. Further introductions are in order.

---

**2.** The vast number of named defendants and their very different relationships to each other and the complained of actions presents the Court with the possibility of unintended ambiguity. To minimize that possibility the Court adopts the following conventions for referring to the members of the defendant group and subgroups of it. Where it is possible to distinguish among the original defendants by referring to them individually or in easily denominated groups, the opinion will do so. When it is preferable to refer to groups of the defendants collectively, the following conventions will apply. When the word "defendant" is capitalized, it refers to all the persons and corporations who remained parties to the case before this ruling. Hence, "Defendants" refers to Jefferson Downs, Fair Grounds, Finish Line, Bryan Krantz, Marie Krantz, the Committee to Control Gambling, Peter Henry, George Boudreaux, and Larry Bankston. Where "defendants" is not capitalized, the word will refer to some other subgroup of the original defendants. The surrounding text will always provide the necessary context to tell precisely what subset of the original defendant group is intended.

**3.** These dismissed defendants were all state actors. All but Melinda Tucker were members of the Louisiana State Racing Commission. Melinda Tucker worked as an Assistant Attorney General for the Louisiana Attorney General's Office. The settlement required the Louisiana State Racing Commission to grant Livingston Downs a license to operate its planned racetrack so long as Livingston Downs managed to obtain appropriate financial backing. Ultimately, the Commission refused the license because of a flaw with the financing. Livingston Downs sued to force the Commission to grant the license, but lost on appeal. *Jefferson Downs Corp., Inc. v. Louisiana State Racing Commission*, 751 So.2d 465 (La.App. 4th Cir.2000), *cert. denied*, 531 U.S. 1011, 121 S.Ct. 565, 148 L.Ed.2d 485 (2000), *rehearing denied* 531 U.S. 1133, 121 S.Ct. 898, 148 L.Ed.2d 804 (2001). This Court refused Livingston Downs' motion to bring these defendants back into this suit based on the alleged violation of their settlement. Doc. 428.

### 1. The Plaintiff: Livingston Downs Racing Association

Livingston Downs Racing Association ("Livingston Downs") is a Louisiana corporation domiciled in the Parish of Livingston, Louisiana. In October of 1992, it began the process required to open a racetrack featuring live horse racing and to provide OTB parlors, which according to Louisiana statute may only be owned and operated by interests that also operate a horse racing establishment.[4] The horse racing business is tightly regulated by the State of Louisiana. Livingston Downs had the opportunity to open the track only because defendant corporation Jefferson Downs had decided to close its racetrack. Livingston Downs had to obtain a permit to operate a racetrack, gain a transfer of the license once held by Jefferson Downs to operate OTB parlors from the Racing Commission, and obtain the approval of the voters in Livingston Parish. Upon commencing to navigate these regulatory obstacles, Livingston Downs faced immediate resistance that it now attributes to the machinations of the Krantzes and their agents.

### 2. Jefferson Downs Corporation

Jefferson Downs Corporation ("Jefferson Downs") is a Louisiana Corporation domiciled in Jefferson Parish, Louisiana. Until October, 1992, Jefferson Downs operated a racetrack that featured live horse racing. The racetrack was also called Jefferson Downs. In addition, Jefferson Downs housed several OTB parlors associated with its racetrack operations. In October, 1992, Jefferson Downs decided to close its racetrack. Because Louisiana state law limits the number of tracks that may operate within a region, this closure gave Livingston Downs the opportunity to open its own racetrack. Livingston Downs claims that Jefferson Downs, through its ownership, has been involved in the plan to keep Livingston Downs out of the market for live horse racing and OTB parlors throughout the relevant period. Jefferson Downs, among other parties, filed suit against the Louisiana State Racing Commission to annul the license granted to Livingston Downs on December 10, 1992.[5] The reason for Jefferson Downs' continued interest is that its owners also control the only racetrack that was operating in the area at the time.

### 3. Finish Line Management Corporation

Finish Line Management Corporation ("Finish Line") is a Louisiana Corporation conducting business in Orleans, Jefferson, St. Charles, St. Tammany, and Terrebonne Parishes. Finish Line Management at one time operated the OTB parlors associated with Jefferson Downs. After Jefferson Downs closed, Finish Line entered an agreement to continue operating those parlors for Fair Grounds Corporation. According to Livingston Downs, Finish Line, through its ownership, was involved in the plan to keep Livingston Downs out of the market for live horse racing and OTB parlors throughout the relevant period.

---

4. LA. REV. STAT. § 4:211, et seq. The statute actually limits ownership and operation of OTB parlors in Louisiana to racetracks licensed before June 30, 1987. LA. REV. STAT § 4:211(5). Under that law, Livingston Downs could not obtain the OTB license once held by Jefferson Downs. Livingston Downs challenged that law on equal protection grounds in an independent lawsuit and ultimately lost on appeal. *Livingston Downs Racing Ass'n v. State*, 705 So.2d 149 (La. 1997).

5. *Jefferson Downs Corp., et al. v. Louisiana State Racing Comm'n*, Suit No. 92–20961, Div. G, Civil District Court for the Parish of Orleans. Ultimately, the Louisiana Court of Appeals for the 4th Circuit upheld the licensing.

#### 4. *Fair Grounds Corporation*

Fair Grounds Corporation ("Fair Grounds") is a Louisiana corporation doing business in New Orleans. At the time of these events, Fair Grounds operated a racetrack that featured live horse racing. It also operated OTB parlors associated with its racetrack. Because Fair Grounds and Jefferson Downs operated within one hundred miles of each other, they were subject to a regulation that restricted them from holding racing on the same days. Because of this restriction, Fair Grounds held live horse racing only in the Fall and Winter while Jefferson Downs did so only in the Spring and Summer. After Jefferson Downs closed, Fair Grounds sought to acquire the license formerly held by Jefferson Downs to operate its OTB parlors. Livingston Downs claims that Fair Grounds, through its controlling owners, at all times participated in the plan to keep Livingston Downs out of the market for live horse racing and OTB parlors. Specifically, Fair Grounds acted, with Jefferson Downs, as a plaintiff in the action filed to declare the racing license a nullity.[6] It also filed a motion to quash subpoenas with the Racing Commission. Fair Grounds also intervened in Livingston Downs' lawsuit which sought to declare unconstitutional the statute which limited people who could operate OTB parlors.[7]

#### 5. *The Committee to Control Gambling*

The Committee to Control Gambling ("CCG") is a Louisiana corporation doing business in Baton Rouge, Louisiana. It was incorporated in early January of 1993, just a matter of days before the January 16 election which posed the question whether to approve the presence of live horse racing in their parish to the voters of Livingston Parish. Peter Henry appears as the President on the documents of incorporation and George Boudreaux appears as the Secretary–Treasurer. Immediately after incorporating, CCG began an aggressive—and some would say disingenuous—media campaign which sought to convince voters to reject the horse racing referendum. Livingston Downs complains that the campaign involved misrepresentations and that it was part of the scheme to frustrate or delay Livingston Downs' entry into the live horse racing and OTB parlor markets. By an earlier ruling, this Court held that whatever the provenance of Livingston Downs' claims, the activities of CCG were protected by the *Noerr–Pennington* doctrine and that CCG's campaigning could not be the basis for antitrust liability. *Livingston Downs Racing Ass'n v. Jefferson Downs Corp.,* 192 F.Supp.2d 519, 531–32 (M.D.La.2001).

#### 6. *Peter Henry*

Peter Henry is the President of CCG. He was also a long-time employee of Jefferson Downs and, after Jefferson Downs closed, Finish Line. Depo. of Peter Henry at 13–14. For both companies, Henry served in a maintenance position. *Id.* Of his job, he said, "I'm in a position that anyone that's in the office can give me orders. I don't question it. I just follow through." *Id.* at 18. When Henry heard talk about CCG he volunteered to Bryan Krantz to help. *Id.* at 24. Later two company people asked him to be the President. *Id.* at 25. He signed two documents, but otherwise had no CCG duties. *Id.* at 39. These claims by Henry are uncontested.

---

**6.** *Jefferson Downs Corp., et al. v. Louisiana State Racing Comm'n,* Suit No. 92–20961, Div. G, Civil District Court for the Parish of Orleans.

**7.** Suit # 399,563, 19th Judicial District Court. Livingston Downs ultimately lost this suit on appeal, as mentioned previously. *Livingston Downs Racing Ass'n v. State,* 705 So.2d 149 (La.1997).

### 7. George Boudreaux

George Boudreaux is the Secretary–Treasurer of CCG. He was also, at the relevant times, an employee of Fair Grounds. When he was in high school he worked weekends for Jefferson Downs. Depo. of George Boudreaux at 8. When he graduated in 1991 at age 19, he got a job at Fair Grounds, where he worked at an entry level job in marketing earning $200–250 a week. *Id.* at 8–10. Later he transferred to a job working for the Assistant Director of Operations at Fair Grounds. *Id.* at 10. Asked about his qualifications to act as secretary-treasurer for a corporation, he said he was young, "looking at this place being my future, holding on to a dream—that's what it was about." *Id.* at 29. He signed the incorporation documents to protect his employer. *Id.* He performed no other related duties. *Id.* at 44. These claims by Boudreaux are uncontested.

### 8. Karen Thomas

Karen Thomas was, at the relevant times, an employee in Larry Bankston's law office and a resident of Livingston Parish. After the Louisiana State Racing Commission granted Livingston Downs a racing permit, Jefferson Downs and Fair Grounds, among others, sued in Orleans Parish to annul it. After the Livingston Parish Police Jury added a proposition which would allow horse racing in Livingston Parish, the same defendants (as plaintiffs) amended their petition to force a stay of the referendum. In response, Al Ransome, President and Chairman of the Board of Livingston Downs, filed suit in Livingston Parish seeking a writ of mandamus directing the Secretary of State to hold the election.[8] Karen Thomas agreed to file an intervention in that suit. On January 11, 1993, after the trial court issued its writ of mandamus in favor of Livingston Downs, Thomas filed a notice of suspensive appeal and sought an emergency writ. The court of appeals denied the writ. The next day, Thomas took an emergency writ to the Louisiana Supreme Court, which that court also denied. That mandamus suit continued, despite the fact that the racetrack proposition passed on January 16, 1993, until it was dismissed as moot by the Louisiana First Circuit Court of Appeals on October 13, 1995. On January 4, 1993, Karen Thomas filed another suit as plaintiff seeking to enjoin the Secretary of State from conducting the same election.[9] Livingston Downs claims that Karen Thomas was a straw-plaintiff, enlisted by her employer on behalf of the Krantzes. Her participation was necessary in order to give the Krantzes standing to object to the referendum in Livingston Parish. It is admitted that the Krantzes not only paid for this litigation through Fair Grounds but that their lawyer, Larry Bankston, performed the legal work. Thomas claims to have had nothing to do with the litigation short of signing on as the plaintiff.

### 9. Terrence Lee Odom

Terrence Lee Odom was, at the relevant times, the spouse of Tina Simoneaux Odom, another employee of Larry Bankston's law firm. On February 25, 1993, Odom—who had standing as a resident of Livingston Parish—filed a petition to nullify the January 16, 1996 election.[10] Mean-

8. *Ransome v. Secretary of State for the State of Louisiana,* Suit No. 67,710, 21st Judicial District Court, Parish of Livingston.

9. *Thomas v. Secretary of State of Louisiana,* Suit No. 67,728, Division B, 21st Judicial District Court, Parish of Livingston.

10. *Odom v. Livingston Parish Police Jury,* Suit No. 68,130, Division C, 21 st Judicial District

while, Livingston Downs, seeking to obtain a hearing with the Louisiana State Racing Commission for the purpose of obtaining a license to conduct specific race dates, filed a petition for a writ of mandamus in the district court for the Parish of Orleans.[11] On April 22, 1993, Odom filed a petition to intervene. Odom, unlike the Krantzes, had standing in the matter. The trial court granted the mandamus. It is admitted that the Krantzes paid the legal bills in this litigation and that Larry Bankston and his law firm performed the legal work. No one contests that Odom was a straw-plaintiff.

### 10. Larry Bankston

Larry Bankston was, at the relevant times, a member of the Louisiana State Senate. He was also the attorney for Bryan Krantz, Marie Krantz, Jefferson Downs, Finish Line, Fair Grounds, the Committee to Control Gambling, Karen Thomas, and Terrence Odom. Livingston Downs alleges misconduct by Bankston that extends to his activities as a senator and as an attorney in all the lawsuits of which Livingston Downs complains. Livingston Downs also alleges that Bankston, at the behest of the Krantzes, formed and operated the Committee to Control Gambling. This Court granted summary judgment on all claims arising out of Bankston's activities as a legislator. Ruling of June 18, 2001 (doc. 611). Livingston Downs maintains that Bankston's activities as the Krantzes' attorney were instrumental to the scheme to delay or frustrate its business enterprise.

### 11. *Bryan & Marie Krantz*

Bryan and Marie Krantz have at least a controlling interest in each of the above corporations. They admit that they owned 100% of both Jefferson Downs and Finish

Court, Parish of Livingston.

Line. Def. Ans. to Complaint ¶¶ 23, 27 (doc. 70). It is uncontested that they exercise voting control over Fair Grounds. The Fair Grounds Annual Report of 1993 reveals that Marie and Bryan Krantz obtained 72.27% of Fair Grounds' common stock in 1990. It also reveals that they sold that stock on October 1, 1993 to the John G. Masoni Trust. The sale created a voting trust that gave Marie Krantz voting control over those shares until 2008. Marie Krantz was Chairman of the Board and Treasurer of Fair Grounds in 1993. Bryan Krantz was its President. According to Marie Krantz's deposition testimony, Bryan Krantz controlled Fair Grounds' business and operations. It is also apparent that the Krantzes controlled the Committee to Control Gambling. Though CCG incorporated in January of 1993, it had no assets until it received contributions. Among other donations, CCG received money from Continental Advertising, Village Row Partnership, and Fair Grounds. Marie Krantz admitted that she lent $10,000 to Continental Advertising, which is wholly owned by the Krantzes, and another $10,000 to Village Row. Depo. of Marie Krantz, transcript of tape 1, at 146. Both these sums were paid to CCG. *Id.* at 147. Fair Grounds itself donated $10,572 to CCG. According to Marie Krantz, Bryan Krantz decided that Fair Grounds and Continental should make their contributions, Depo. of Marie Krantz, transcript of tape 2 at 35, and Marie Krantz personally authorized the Fair Grounds contribution, Depo. of Marie Krantz, transcript of tape 1 at 147. Livingston Downs alleges that much, if not all, of the money CCG used to run its advertising campaign originated with the Krantzes. The defendants do not contest it.

**11.** Suit No. 93–6366, Division F, Civil District Court for the Parish of Orleans.

Nor was their control over CCG limited to its financing. The incorporation documents list Peter Henry as CCG's President and George Boudreaux as its Secretary–Treasurer. Henry and Boudreaux were, in 1993, low-level employees of Finish Line and Fair Grounds, respectively. Though both these men understood the object of CCG's election campaign, neither knew anything about its operation. George Boudreaux testified that "CCG, to me, is a committee to—looks out for what was going on. We were trying to hold on to what racing was all about, that maybe there might not be no more other—trying to keep the racing stabilized." Depo. of George Boudreaux at 24. Beyond that limited understanding, Boudreaux had nearly no knowledge of the workings of CCG. He did not know how CCG meant to achieve its goal. *Id.* He had no duties related to CCG; he signed the incorporation documents and then had no contact with its operations. *Id.* at 32, 44. Boudreaux once asked Bryan Krantz what was happening with the organization and Krantz replied that "it's being handled by the attorneys." *Id.* at 33. In fact, Boudreaux thinks wrongly that the CCG campaign was successful and that the voters rejected the Livingston Downs racetrack. *Id.* at 44. None of these claims is contested by any party. There is no evidence that George Boudreaux knew anything about any of the other events of which Livingston Downs complains.

Peter Henry was similarly in the dark. He knew that CCG would campaign to stop Livingston Downs from taking over the OTB parlors once operated by Jefferson Downs. Depo. of Peter Henry at 28. When he heard rumors about CCG, he volunteered to help Bryan Krantz in any way he could. In his deposition, Henry evinced some knowledge of CCG's purpose:

Q: And why would that help Bryan Krantz? For you to participate in CCG?

A: Well, it was part of my job. The rumors I heard was that the OTBs were in—trying to be taken over.

Q: That Livingston Downs was trying to take over—

A: Right.

Q: —the OTBs?

*Id.* at 24. Later, two men working for the company approached Henry and asked him to be its president. *Id.* at 25. Despite his title, however, Henry did nothing except sign two documents. *Id.* at 39. He does not know whether CCG remains active. *Id.* at 27. He never saw CCG's publicátions. *Id.* at 28. He does not know whether they prevailed in the referendum. *Id.* at 37. When presented at his deposition with one of CCG's brochures, he said it favored horse racing in Livingston Parish. *Id.* All of these propositions are uncontroverted. There is no evidence that Henry knew anything about any of the other activities of which Livingston Downs complains.

Marie Krantz, in fact, admits that CCG was under the Krantzes' control. In her deposition, she states that "[CCG] was a vehicle in which we could attempt to have some influence on the results of that election, and that's why I did it." Depo. of Marie Krantz, transcript of tape 2 at 33. Livingston Downs does not contest the claim that the Krantzes controlled CCG. It is, in fact, one of their primary contentions.

### 12. *The Louisiana State Racing Commission Members*

On December 10, 1992, the Louisiana State Racing Commission granted a racing permit to Livingston Downs. Livingston Downs complains of all other interactions with the Commission. The Racing Commission later withdrew the permit. It al-

leges that the Commission, through former defendants Oscar Tolmas, Albert Stall, Payton Covington, Ben Thomas, and W.C. Littleton, conspired with the Krantzes to delay the opening of Livingston Downs. All of these defendants have been dismissed pursuant to the settlement discussed above. The order dismissing these defendants did not dismiss any of Livingston Downs' claims. Consequently, Livingston Downs' allegations of conspiracy among the Krantzes, these Commission members, and Melinda Tucker continue to be relevant at this stage of the action. The Commission members themselves, however, cannot be liable for the alleged conspiracy.

### 13. *Melinda Tucker*

Melinda Tucker was, at the relevant time, an Assistant Attorney General for Louisiana who acted as legal advisor to the Louisiana State Racing Commission. Livingston Downs complains of her complicity in the delay tactics of the Commission. Livingston Downs also claims that she handled legal matters for the Racing Commission and sought to delay their resolution. She also has been dismissed from the action pursuant to the same settlement that released the Commission members.

### PROCEDURAL BACKGROUND

Originally, Livingston Downs sought redress under 42 U.S.C. §§ 1983, 1985, and 1986, and under 15 U.S.C. § 15 for violations of 15 U.S.C. § 1. The original complaint (doc. 1) also claims that the defendants attempted to monopolize the relevant markets in horse racing and OTB parlors. After dismissal of the government defendants, the Court dismissed the civil rights actions for lack of a government actor. Subsequently, Livingston

Downs added claims under the Racketeering Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1964(c), which allows parties injured by violations of RICO to recover damages.

In addition to the party dismissals described above, the Court has also rejected certain other claims. Livingston Downs cannot proceed against Larry Bankston in his capacity as a Louisiana State Senator. Ruling of June 18, 2001 (doc. 611). Moreover, Livingston Downs cannot base its antitrust claims on any of the following: (1) the campaign activities of CCG; (2) attempts to influence the executive activities of the Louisiana State Racing Commission; (3) lobbying by any defendant of the state legislature or the racing commission; (4) or any lawsuit in which the Defendants prevailed. *Livingston Downs Racing Ass'n v. Jefferson Downs Corporation*, 192 F.Supp.2d 519 (M.D.La.2001). Finally, Livingston Downs cannot recover lost profits as damages under RICO. *Id.*

The Court is now faced with the question whether Livingston Downs has properly stated its claims under the theories of recovery it has put forward and if so, whether it has presented sufficient evidence to survive summary judgment. Of most importance to this set of motions are the following three questions: (1) Has Livingston Downs alleged a scheme to defraud under the mail and wire fraud statutes?;[12] (2) Has Livingston Downs supported the claim that there is a plurality of parties to the Krantz conspiracies, as required under § 1 of the Sherman Act?; and (3) Has Livingston Downs alleged a violation of § 2 of the Sherman Act?

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to in-

---

**12.** The mail and wire fraud statutes are two of many criminal statutes that may serve as predicate violations under the RICO statue.

Without at least two predicate violations—two acts of racketeering—there can be no RICO violation.

terrogatories, admissions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the burden at trial rests on the non-moving party, as it does here, the moving party need only demonstrate that the record lacks sufficient evidentiary support for the non-moving party's case. *Id.* The moving party may do this by showing that the evidence is insufficient to prove the existence of one or more elements essential to the non-moving party's case. *Id.*

Although this Court considers the evidence in the light most favorable to the non-moving party, the non-moving party may not merely rest on allegations set forth in the pleadings. Instead, the non-moving party must show that there is a genuine issue for trial. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conclusory allegations and unsubstantiated assertions will not satisfy the non-moving party's burden. *Grimes v. Tex. Dep't of Mental Health,* 102 F.3d 137, 139–40 (5th Cir. 1996). If, once the non-moving party has been given the opportunity to raise a genuine factual issue, no reasonable juror could find for the non-moving party, summary judgment will be granted for the moving party. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *see also,* FED. RULE CIV. P. 56(c).

## ANALYSIS

### I. RICO Claims

The Livingston Downs civil RICO claims focus on numerous alleged violations of the mail and wire fraud statutes. As this Court wrote in its ruling of September 23, 2002 (doc. 711), the basis for Livingston Downs' claim for damages under the civil RICO statute pieces together as follows:

First, Plaintiff claims that Fair Grounds conceived a "scheme or artifice to de-fraud." That scheme or artifice, apparently, was the larger plan to tie up Plaintiff and its business plans by initiating a string of baseless lawsuits and other petitioning activities whose goal was delay, not success on the merits. Fair Grounds violated § 1341, Plaintiff claims, by using the wires and mails to carry out that larger plan. So, for example, Plaintiff claims that Fair Grounds sent an initial pleading in a suit brought by Terrence Lee Odom (as a straw-plaintiff) on September 13, 1993 to Joseph R. Martin, Paul H. Benoist, Angie R. LaPlace, Rodney N. Erdey, and the 21st Judicial District Court Clerk. Pltff's Rico Case Stmnt, Exhibit 1. Plaintiff alleges forty separate uses of the wires and mails that are related to the execution of the Odom and Thomas lawsuits alone. Each of these could constitute an independent count of mail or wire fraud if there was an overarching scheme to defraud and if court filings are not protected from being the basis of a mail fraud charge. Presumably, the assertion is that they used the postal service to effect each of these mailings. So, Plaintiff argues, Fair Grounds repeatedly violated § 1341 and § 1343 by using interstate communications systems to advance their scheme. These violations are included under § 1961(1) as racketeering activities. The multiple instances qualify them as a pattern of racketeering activities under § 1961(5), since forty is greater than two. Fair Grounds, Plaintiff claims, conducted their business in part through this pattern of racketeering activities, since the entire plan sought to advance the Fair Grounds business interests. Consequently, they violated § 1962(c), at least. Finally, Plaintiff alleges a cause of action under § 1964(c) as a party injured by reason of Fair Grounds' § 1962(c) violation. Plaintiff also alleges that Fair

Grounds conspired to violate the substantive subsections of § 1962 and consequently violated § 1962(d) as well.

Ruling & Order at 9–10 (doc. 711).[13] Consequently, the nub of Livingston Downs' RICO complaint is that these Defendants entered a scheme to defraud which they facilitated by using interstate means of communication. If this particular complaint is to survive summary judgment, Plaintiff must, in the first instance, be capable of sustaining the claim that Defendants' scheme was a scheme to defraud.

■ This Court follows the Eleventh Circuit decision *United States v. Pendergraft*,[14] in concluding that Livingston Downs has not made allegations necessary to establish a mail fraud violation. In *Pendergraft*, the Eleventh Circuit reversed the mail fraud convictions of two men who filed false affidavits in court as part of a scheme to obtain a settlement in their lawsuit against a county government. The defendants meant to indicate to the government their willingness to lie to the court and thereby to impose pressure to avoid a court battle. The county government knew that the affidavits were false, but the court did not. The Eleventh Circuit reversed the convictions for mail fraud, holding that there was no scheme to defraud because the defendants did not have an intent to deceive. The court noted that the word "defraud" in the mail and wire fraud statutes "still signifies 'the deprivation of something of value by trick, deceit, chicane, or overreaching.'" *Pendergraft*, 297 F.3d at 1208 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924)).

The Eleventh Circuit found that the defendants did not have the requisite intent to deceive the county because they knew that the county would not be fooled by their affidavits:

> In support of their suit against Marion County, Pendergraft and Spielvogel authored affidavits that falsely accused Cretul of making threats. Such falsity might have deceived some, but it could not deceive Marion County. Cretul, after all, was the Chairman of the Marion County Board of Commissioners, and Pendergraft and Spielvogel were aware of Cretul's position. They knew that Cretul would deny making these threats, and they knew that their affidavits would not trick Cretul into admitting otherwise. If they knew that they could not deceive Marion County, then they could not have had an intent to deceive. [. . .] Since there was no intent to deceive, there was no scheme to defraud.

*Id.* at 1209. Though defendants clearly sought to use deceit of the court to advance their chances of depriving the county of its property, their deceit did not amount to fraud because it was not directed at the County.

The situation is similar in this case. None of the Defendants sought to deceive Livingston Downs. As in *Pendergraft*, if the Defendants sought to deceive anyone, it was the courts and other government actors. Defendants allegedly presented the courts, the voters, and the Racing Commission with misleading information and baseless claims in the hope that they would be fooled into depriving Livingston Downs of the necessary legal backing to

---

**13.** In the September 23 ruling, the Court referred to all the Defendants collectively as "Fair Grounds," following defendants' lead, because it was not important for the purpose of that ruling—as it is for this one—to distinguish among them. It bears noting, as well, that Livingston Downs also claims that the Defendants violated § 1962(a) and (b) and conspired to violate these substantive subsections. The discussion above mentions only the subsection (c) violation solely to simplify the narrative.

**14.** 297 F.3d 1198 (11th Cir.2002).

open their business or, at the very least, be fooled into delaying its entry into the market. Livingston Downs does not allege and presents no evidence that Defendants at any point sought to deceive it. Without that intent to deceive, there can be no mail fraud violation.

■ The import of the Eleventh Circuit's ruling is that one cannot commit fraud by fooling one person to receive something of value from another. There are independent torts that form the basis for such causes of action. Livingston Downs could have brought suit against the defendants for malicious prosecution, for example. There is no reason to expand the scope of mail and wire fraud statutes to include attempts to obtain a third party's property by deceiving the courts (or other government actors), especially when independent causes of action exist to serve the same end.[15]

It is unavailing to argue that § 1964(c) of the RICO statute allows recovery for people who are incidentally injured by RICO violations because the Court finds that there was no mail fraud in the first place. It is true that some courts, including the Fifth Circuit, have allowed individuals who were not the target of the underlying RICO violations to survive motions to dismiss on their claims to recover for damages caused by the fraud. *See Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 564–65 (5th Cir.2001); *Summit Prop-* *erties, Inc. v. Hoechst Celanese Corp.*, 214 F.3d 556 (5 th Cir.2000), *cert. denied,* 531 U.S. 1132, 121 S.Ct. 896, 148 L.Ed.2d 802 (2001); *Shaw v. Rolex Watch, U.S.A.*, 726 F.Supp. 969, 973 (S.D.N.Y.1989). The procedural posture of these cases is of the utmost importance. In all the named cases, the courts were faced with or reviewing motions to dismiss for failure to state a claim under Rule 12(b)(6). In each case, the plaintiff claimed that the defendant had committed fraud against a third party and that the plaintiff had been hurt by that fraud. Normally, in such a situation, the courts require for recovery under § 1964(c) that the plaintiff allege that she herself relied on the misrepresentation that forms the basis of the fraud. *See Summit Properties*, 214 F.3d at 561. *Summit Properties* held that in some instances it is possible to make out the proximate cause element of a § 1964(c) claim without showing reliance, so long as all "the other elements of proximate cause are present." *Id.* So, *Summit Properties* recognized some reason to hold "open the possibility that a plaintiff company may not need to show reliance when a competitor lured the plaintiff's customers away by a fraud directed at the plaintiff's customers." *Id.* (discussing *Procter & Gamble* ). Though the proposed facts are suggestively similar, there is an important difference: In the *Summit Properties* setting, the court assumed that there was an underlying RICO violation to begin with. The

---

**15.** An independent problem with Livingston Downs' mail fraud theory of liability is that Livingston Downs would have to establish that it was deprived of a property interest to substantiate its claim. To be guilty of mail fraud, the defrauder must have an intent to use deceit for the purpose of divesting another person of a property interest. Seemingly, Livingston Downs' complaint is that the Krantzes connived to deprive it of state licenses and of the voter approval required to use those licenses. Interestingly, in another case which involved Larry Bankston and Louisiana gambling licenses, the Supreme Court held that a license in the hands of the state is not property for the purpose of the mail fraud statute. *See Cleveland v. United States*, 531 U.S. 12, 20, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000) (holding that the mail fraud statute "does not reach fraud in obtaining a state or municipal license of the kind here involved, for such a license is not 'property' in the government regulator's hands."). This Court does not rule on this alternate ground because the parties have never focused on the issue.

Fifth Circuit wrote, "[t]hus, if P & G's customers relied on *the fraudulent rumor* in making decisions to boycott P & G products, this reliance suffices to show proximate causation." *Id.* (emphasis supplied). Similarly, in *Shaw v. Rolex Watch,* the Southern District of New York held that "[a] plaintiff who is injured *as a proximate result of fraud* should be able to recover regardless of whether he or a third party is the one deceived." *Shaw,* 726 F.Supp. at 973 (emphasis supplied). Both these statements assume that the plaintiffs' allegations of fraud are true and conclude that it does not matter for stating a civil RICO claim for damages proximately caused by the fraud that the plaintiff did not rely on the misrepresentation.

This Court's holding in the instant case is different. The question here is not whether Livingston Downs has properly alleged that its damages were proximately caused by the defendants' acts. This Court held in its August 13, 2001 ruling that there was a triable question of fact whether defendants' actions proximately caused Livingston Downs to incur legal fees. The question now presented is whether Livingston Downs has successfully alleged the specifics of the underlying mail fraud violation. The cited cases do not touch this issue. It is not clear why the courts in those cases did not require the plaintiffs to allege fraud with particularity as is required under Federal Rule of Civil Procedure 9(b), but it is clear and this Court holds that Livingston Downs has not sufficiently supported the claim that any of the defendants committed mail fraud.

Livingston Downs could rely on the above discussed theory of liability if it could prove that the defendants committed mail fraud against the courts. Then it would be able to claim that it was injured by the courts' reliance on the defendants' misrepresentations to the courts and other government agencies. Unfortunately for Livingston Downs, this option is not available either. To sustain a mail fraud claim, a plaintiff must allege and prove (1) a scheme or artifice to defraud and (2) execution of that scheme *by use* of interstate mails. To be a scheme to defraud, the object must be deprivation of a property interest. Livingston Downs alleges that the Defendants set out to deprive it of its property. It nowhere alleges that the Defendants sought to deprive the government of a property interest—even an intangible property interest. In essence, Livingston Down's claim is that the Defendants sought to fool the government into depriving Livingston Downs of its property. While such an action may be some independent tort under state law, it is not mail fraud, even if it did cause Livingston Downs some concrete damage.

The Court notes that many other courts have rejected the notion that filing litigation documents can serve as the basis of a RICO violation. Several courts have rejected the theory that legal filings may constitute mail fraud. *See Daddona v. Gaudio,* 156 F.Supp.2d 153, 162–64 (D.Conn.2000); *Auburn Med. Ctr., Inc. v. Andrus,* 9 F.Supp.2d 1291, 1300 (M.D.Ala. 1998); *von Bulow v. von Bulow,* 657 F.Supp. 1134, 1142–46 (S.D.N.Y.1987). Other courts have refused to treat filing or the threat of filing legal documents as extortion under the Hobbs Act (another RICO predicate). *See I.S. Joseph Co., Inc. v. J. Lauritzen A/S,* 751 F.2d 265, 266–67 (8th Cir.1984)(stating that threats to sue are not extortion under the Hobbs Act); *G–I Holdings, Inc. v. Baron & Budd,* 179 F.Supp.2d 233, 255 (S.D.N.Y.2001) (same). The first set of cases refuses to apply the mail fraud statute, not because its application is inapt, but because doing so would frustrate other policies. So, for example, in *Auburn Medical,* the court thought that the mail fraud claim was merely an "artful-

ly pled" malicious prosecution claim. It refused to apply the mail fraud statute while also refusing to hold that the statute's language did not apply. The second set of cases refuses to interpret extortion to include threats to sue. All these cases note the possible conflict between allowing such suits and the principle that citizens should be able freely to petition their government. While the former cases base their rulings on policy considerations, the latter find statutory grounds for avoiding the policy question.

This Court follows the latter approach. Insofar as these cases interpret the Hobbs Act, they are irrelevant. Their approach, however, is instructive. The Court shares the worries regarding the First Amendment right to petition that all these courts mention, but does not reach that issue because the central holding is that the actions of the Defendants, however culpable, do not constitute fraud against Livingston Downs. Defendants did not have the intent to deceive Livingston Downs. Consequently, there was never a scheme to defraud and the mailings did not constitute mail fraud violations. There is, as a result, no RICO violation. The motions for summary judgment on the RICO claims filed by all Defendants are, therefore, granted.

## II. Sherman Act Claims

### A. Section 1

■ The essential core of Livingston Downs' claims is stated very nicely in one of its submissions to this Court. It wrote that "[t]he defendants have again tried to hide behind the corporate identities they created and control." Memo Supporting Motion to Compel Discovery at 18. Here is the gravamen of Plaintiff's § 1 antitrust claims: The Krantzes engaged in an anticompetitive conspiracy by acting through the corporations they owned and controlled, their employees, and their agents. While the Court agrees that this conduct

may have been a conspiracy in the colloquial sense, it cannot be a conspiracy in the sense meant by § 1 of the Sherman Act. A § 1 antitrust conspiracy requires that two persons act in concert. *See Copperweld Corp. v. Independence Tube Corporation*, 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). In *Copperweld*, the Supreme Court noted the importance of plurality for a § 1 claim as follows:

> The Sherman Act contains a "basic distinction between concerted and independent action". The conduct of a single firm is governed by § 2 alone and is unlawful only when it threatens actual monopolization. It is not enough that a single firm appears to "restrain trade" unreasonably, for even a vigorous competitor may leave that impression. [ . . . ] Section 1 of the Sherman Act, in contrast, reaches unreasonable restraints of trade effected by a "contract, combination . . . or conspiracy" between separate entities. It does not reach conduct that is "wholly unilateral." [ . . . ] The reason Congress treated concerted behavior more strictly than unilateral behavior is readily appreciated. Concerted activity inherently is fraught with anticompetitive risk. It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands.

467 U.S. at 767–68, 104 S.Ct. 2731. The case law that has grown up around § 1 establishes certain rules for individuating antitrust conspirators so that formal distinctions do not disguise actual unity. Those rules work against Livingston Downs.

■ Individuation of conspirators turns on an inquiry into who controls the action and whether there is a unity of interests. A wholly owned subsidiary of a corporation cannot conspire with its parent corporation. *Copperweld*, 467 U.S. 752,

771–772, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Two subsidiaries wholly owned by the same parent corporation cannot conspire with their parent or with each other. *See, e.g., Hood v. Tenneco Texas Life Ins. Co.,* 739 F.2d 1012, 1015 (5th Cir.1984); *Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co.,* 833 F.2d 606, 611 (6th Cir.1987). The officers, directors, employees, representatives, and agents of a corporation cannot conspire with their corporate employer. *Nelson Radio & Supply Co. v. Motorola,* 200 F.2d 911, 914 (5th Cir.1952); *see also, Schwimmer v. Sony Corp. of America,* 677 F.2d 946, 953 (2d Cir.1982), *cert. denied,* 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398. Two corporations that are wholly owned by the same group of individuals cannot conspire with each other. *Century Oil Tool, Inc. v. Production Specialties, Inc.,* 737 F.2d 1316 (5th Cir. 1984); *see also, Guzowski v. Hartman,* 969 F.2d 211, 214 (6th Cir.1992). The only remaining potential co-conspirators are the government actors. It is also established as a matter of law that petitioned government actors cannot be antitrust coconspirators, *Columbia v. Omni Outdoor Advertising,* 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), and this Court earlier foreclosed the possibility that the Defendants could be liable for an antitrust conspiracy with the government actors even if they were capable entering such a conspiracy. *Livingston Downs,* 192 F.Supp.2d at 536.

### 1. Jefferson Downs & Finish Line

If there is an antitrust conspiracy presented by this case, it cannot have been among Bryan Krantz, Marie Krantz, Jefferson Downs, and Finish Line; they can only have participated in a conspiracy with some other actor. That result is demanded by both *Century Oil Tool* and *Nelson Radio.* *Nelson Radio* precludes a conspiracy between the Krantzes and their corporations unless the Krantzes were acting in their own, rather than in the corporation's, interest. *Nelson Radio,* 200 F.2d at 914. *Century Oil Tool* establishes that two corporations with the same set of owners cannot conspire under § 1 of the Sherman Act. *Century Oil Tool,* 737 F.2d at 1317. In this case, among these three alleged actors there is unity of interests. Bryan and Marie Krantz are directors and officers of both Jefferson Downs and Finish Line, as well as 100% owners of both. The Krantzes cannot conspire with their corporations and because those corporations have identical ownership, the corporations cannot conspire with each other. For the purposes of a § 1 conspiracy, these three defendants are one and the same; they cannot merge through a conspiracy formerly disparate economic interests.

### 2. Fair Grounds

Though it is a closer case, the same result obtains for Fair Grounds. When the Supreme Court announced in *Copperweld* that a wholly-owned subsidiary cannot conspire with its parent corporation, it adverted to the following reasons:

> A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver.

*Copperweld,* 467 U.S. at 771, 104 S.Ct. 2731. Though the Supreme Court specifically limited its holding to the parent-subsidiary context, later courts have relied on these reasons to extend the rule to similar situations. So, for example, the Fifth Circuit relied on this reasoning to conclude, in *Century Oil Tool,* that two companies both jointly owned by the same three men could not conspire with each other. *Century Oil Tool,* 737 F.2d at 1317.

Other courts have used the same reasons to conclude that there can be no § 1 conspiracy between one corporation and another corporation that it legally controls. *Direct Media Corp. v. Camden Tel. & Tel.*, 989 F.Supp. 1211, 1217 (S.D.Ga.1997); *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 344 (N.D.Ill.1997); *Bell Atl. Bus. Sys. Servs. v. Hitachi Data Sys. Corp.*, 849 F.Supp. 702, 706–07 (N.D.Cal.1994); *Total Benefit Servs., Inc. v. Group Ins. Admin. Inc.*, 1993 WL 15671, *1–2 (E.D.La.1993); *Leaco Enters., Inc. v. General Elec. Co.*, 737 F.Supp. 605, 608–09 (D.Or.1990); *Novatel Communs. v. Cellular Telephone Supply*, 1986–2 Trade Cas. (CCH) ¶ 67, 412, at 62, 172–73, 1986 WL 15507 (N.D.Ga.1986). These courts have established different tests for control. The court in *Novatel*, for example, held that a bare majority of ownership was sufficient. In that case, the parent owned 51% of its subsidiary. *Novatel*, 1986–2 Trade Cas. (CCH) at ¶ 62, 172–73, 1986 WL 15507. The court in *Direct Media* agreed. *Direct Media*, 989 F.Supp. at 1217. The District Court in Oregon has taken a different approach. It held that if a parent can force a merger with the subsidiary, then they should be treated as having a unity of interests as a matter of law. So, in *Aspen Title & Escrow, Inc. v. Jeld–Wen, Inc.*,[16] the court refused to find unity of interest and control when an individual alleged conspirator owned only 60% of a defendant company's stock as well as when a second company owned 75% of a third company's stock. According to that court "only corporations which are owned 100% in common, or a *de minimis* amount less than 100% are covered by the *Copperweld* rule." *Aspen Title*, 677 F.Supp. at 1486. A later decision by the same court clarified its rule, however. In *Leaco*, the court held that the proper test for control is whether the parent company can force a merger. *Leaco*, 737 F.Supp. at 608–9. In a jurisdiction where 67% ownership suffices to force a merger, the court held that 91.9% ownership by a parent of a subsidiary precludes their participation in a § 1 conspiracy. *Id.* at 609.

Applying the reasoning of the Fifth Circuit in *Century Oil Tool*, it is apparent that the control test should extend to circumstances in which, as here, the same individuals control two corporations. In *Century Oil Tool*, the Fifth Circuit wrote:

> Given *Copperweld*, we see no relevant difference between a corporation wholly owned by another corporation, two corporations wholly owned by a third corporation or two corporations wholly owned by three persons who together manage all affairs of the two corporations. A contract between them does not join formerly distinct economic units. In reality, they have always had "a unity of purpose or a common design."

*Century Oil Tool*, 737 F.2d at 1317. If the *Copperweld* rule for inter-corporate ownership extends to individual ownership, the Court sees no reason that the question of corporate control should be treated any differently. Where two people together are controlling the affairs of separate corporations those corporations cannot conspire under § 1 of the Sherman Act.

Though the fact that the control test should apply to individual ownership just as it does to corporate ownership is clear, it is not clear that the same test is relevant. It does not seem relevant to ask, in the individual setting, whether the individual owner can force a merger between the two (or three) corporations. Instead, what is important is whether the individual can control the policies of both (or all) corporations. If so, then there can be no conspiracy between (or among) the corporations.

---

**16.** 677 F.Supp. 1477 (D.Or.1987).

Thus, the Court need not decide between the rules proposed for inter-corporate ownership. It is uncontested that Marie Krantz has control of 72.27% the voting stock at Fair Grounds. Her testimony that Bryan Krantz, as President, controls the company policy is also uncontested. Moreover, Livingston Downs has not even alleged that these corporate and individual interests are in any respect disparate. Consequently, Fair Grounds cannot be the second party to an antitrust conspiracy in this case as a matter of law.[17]

### 3. Peter Henry, George Boudreaux & Larry Bankston

Similarly, Peter Henry, George Boudreaux, and Larry Bankston are incapable of conspiring with the Krantzes and the corporate entities. In order properly to allege that an employee or agent of a corporation has entered a conspiracy with other employees or the corporation, a plaintiff must allege that the employee or agent was acting outside of her normal employment capacity. *Nelson Radio,* 200 F.2d at 914. Peter Henry was an employee of Jefferson Downs and later of Finish Line. George Boudreaux was an employee of Fair Grounds. Larry Bankston was engaged in the service of the Krantzes and their corporations as an attorney. These facts are uncontested. Moreover, Livingston Downs does not allege that these actors were acting in their own interests. On the contrary, Livingston Downs goes to great lengths to assert that these defendants were acting as the agents of the Krantzes and were exclusively pursuing the Krantzes' interests.[18]

---

**17.** Whether an antitrust conspiracy is possible does not require a factual determination. In *Bell Atlantic,* the court reasoned as follows:

Under the reasoning of *Copperweld* and its progeny, it is not necessary to conduct a factual inquiry to determine whether a parent and a subsidiary over which the parent has legal control can conspire in violation of § 1 of the Sherman Act. *Copperweld* found that a parent and a wholly-owned subsidiary are considered the "same entity" for antitrust purposes because the parent has the power to exercise full control over its subsidiary. For the same reasons, a parent and a subsidiary over which the parent has legal control cannot conspire to restrain trade.

*Bell Atlantic,* 849 F.Supp. at 706.

**18.** It is irrelevant that these agents may have, in addition to the duties they owe their employers, distinct individual motivations for pursuing the same acts. What is important is that they are, in fact, pursuing the interests of their employers. So, for example, Larry Bankston may have been driven solely by a desire to run up legal fees or out of personal animus for the ownership of Livingston Downs. These facts would not matter. The only important fact is that the Krantzes or their corporations hired Bankston to perform certain duties for pay. That relationship removes Bankston from the universe of poten-

tial co-conspirators for the Krantzes. The only exception to this general rule applies when an agent seeks to advance her own interests as a marketplace actor. *Siegel Transfer, Inc. v. Carrier Exp., Inc.,* 54 F.3d 1125, 1136–37 (3d Cir.1995)("[F]or the concept of a conspiracy between a principal and an agent to apply in the antitrust context, the exception to the general rule should arise only where an agent acts to further his own economic interest in a marketplace actor which benefits from the alleged restraint, and causes his principal to take the anticompetitive actions about which the plaintiff complains. In this way, the exception captures agreements that bring together the economic power of actors which were previously pursuing divergent interests and goals, the type of activity that section 1 was intended to oversee."); *Oksanen v. Page Memorial Hosp.,* 945 F.2d 696, 705–06 (4th Cir.1991)(examining whether members of the staff directly benefitted from the plaintiff's elimination as a competitor, and whether the staff caused the hospital to engage in the alleged restraint); *Pink Supply Corp. v. Hiebert, Inc.,* 788 F.2d 1313, 1318 (8th Cir.1986)("We construe 'for the agent's own benefit' to mean at least an economic stake in the gain to be realized from the anticompetitive object of the conspiracy.") Henry, Boudreaux, and Bankston have no such stake. Henry and Boudreaux sought

As a matter of law, then, Livingston Downs has failed properly to allege that these defendants were involved in a § 1 conspiracy and their claims under that section against these defendants must be dismissed. In addition, the evidence so far accumulated makes it clear that no reasonable juror could find that these defendants acted independently. The only evidence available suggests that these men acted to advance the interests of the Krantzes. No evidence has been presented to suggest otherwise. Consequently, even had Livingston Downs properly alleged independence, these claims should be dismissed.

Even if Peter Henry and George Boudreaux could have entered an antitrust conspiracy with the Krantzes, the § 1 claims against them would have to be dismissed. This Court has held that the activities of CCG cannot by themselves constitute an antitrust violation. *Livingston Downs*, 192 F.Supp.2d at 531. Consequently, the only possible argument for the liability of these two men is that they agreed to enter the larger conspiracy against Livingston Downs, and while they cannot be liable for their own acts, they can be liable for the larger conspiracy through the acts of their co-conspirators. That argument is unavailing.

■ To be an antitrust co-conspirator, a defendant must have consciously adopted the antitrust scheme. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Spectators' Communication Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir.2001). Livingston Downs cannot substantiate this claim. There is no evidence that Boudreaux or Henry knew anything about the scope of the Krantzes' plan. The evidence barely supports the claim that they knew what the CCG portion of that plan entailed. Both signed documents and agreed to do so either out of loyalty to their employers or a sense that their jobs would be made more secure. All that this establishes is that they agreed to facilitate protected political speech. Boudreaux thought that the campaign succeeded, while Henry did not know the outcome. There is absolutely no evidence that these two knew anything about any lawsuit, lobbying, or petitioning. Therefore, even if Boudreaux and Henry could have—despite their agent status—entered the larger conspiracy, they did not.

This holding establishes an alternative ground for concluding that Peter Henry and George Boudreaux do not provide Livingston Downs the elusive second actor. Not only must the § 1 claim against them be dismissed, but Livingston Downs must continue its search to maintain its § 1 claims against any of the defendants.

### 4. The Committee to Control Gambling

The question who controls the Committee to Control Gambling is very different. Livingston Downs must establish that there is a plurality of actors involved in the alleged conspiracy for § 1 of the Sherman Act to be the appropriate vehicle for its claims. In the corporate ownership or agency relationship settings, unity of interest is established by degree of ownership and control or by the nature of the parties' relationship as a matter of law. Here, however, these factors are inapplicable. CCG had no assets at its incorporation. It accepted and expended contributions in order to campaign against a referendum proposition. Its corporate officers have no ownership interest in the corporation. And though those officers are employees of Krantz-controlled corporations, CCG is

---

personal advantage only in job security. Larry Bankston, insofar as the evidence shows,

sought only to provide the legal services requested by the Krantzes.

not itself an agent of the Krantzes. Consequently, in deciding whether CCG is under the control of the Krantzes and therefore incapable of entering a § 1 conspiracy with them, the Court faces a factual determination. It is only appropriate for the Court to resolve this factual matter if Livingston Downs has failed to show that there is a genuine question of fact whether CCG and the Krantzes (et al.) represent a plurality of interests. If no reasonable juror could conclude from the pleadings, depositions, answers to interrogatories, admissions, and affidavits on file that CCG represents interests separate and apart from the Krantzes', then the Court may conclude that CCG is one with the other Krantz-controlled entities for purposes of the Sherman Act.

Despite this burden, Livingston Downs has, throughout this case, tried to establish that CCG is an alter-ego of the Krantzes. All of the evidence presented on the question indicates that Livingston Downs is correct on this point. The Defendants have not presented any contrary evidence. The Court's situation is delicate because it is Plaintiff's duty to allege and come forward with evidence that multiple parties participated in this purported conspiracy, yet Livingston Downs has dedicated itself to opposing that proposition. Consequently, Livingston Downs has failed properly to allege that CCG is a separate entity. In fact, Livingston Downs has presented enough evidence to prevail on a motion for summary judgment on the claim that CCG *is not* a separate entity for the purposes of a § 1 conspiracy. Deposition testimony by the CCG corporate officers—also the Krantzes' employees—and Marie Krantz indicates that these officers knew next to nothing about CCG or its operation; that Bryan Krantz had directed his attorneys to run the outfit; that Marie Krantz, Bryan Krantz, and their corporate alter-egos financed CCG; and that Marie Krantz regarded the operation as a way to

delay Livingston Downs from entering the relevant market. There is not even a metaphysical doubt whether CCG was a tool of the Krantzes formed to convince the Livingston Parish voters to oppose the operation of a racetrack in their parish. CCG was not only controlled by the Krantzes, but operated to their specifications. Consequently, CCG could not have been the requisite second party to the alleged § 1 conspiracy.

### 5. Karen Thomas & Terrence Lee Odom

The same analysis applies to Karen Thomas and Terrence Lee Odom. The Krantzes managed to get themselves into court by soliciting straw-plaintiffs with standing to represent their interests. Once again, this version of the events is the one preferred by Livingston Downs, much to its legal detriment. Presented with the burden of raising some evidence that Karen Thomas and Terrence Lee Odom were acting independently of the Krantzes and their business interests, Livingston Downs instead argues that they were mere puppets on the hands of Larry Bankston. Consequently, there is no evidence that these two plaintiffs brought good faith suits in their own interests against the provenance of the Livingston Parish referendum election. On the contrary, it is admitted that the Krantzes, through Fair Grounds, paid for that litigation. Their attorney handled it. Both straw-plaintiffs have given deposition testimony that they had no real participation in the lawsuits. No reasonable juror could find that Thomas and Odom acted independently in bringing these suits. Aside from being in fact used by the Krantzes, they may have been manipulated by Bankston into acting as plaintiffs because of their relationship to his law firm. In any event, no one even claims that they acted independently. Consequently, they too cannot have acted as the elusive second

party to the alleged § 1 antitrust conspiracy with the Krantzes and their other alteregos.

### 6. The Racing Commission Members

Though the members of the Louisiana State Racing Commission and the Assistant Attorney General charged with providing it legal advice were dismissed from this lawsuit, the order of dismissal limited itself to the defendants. The order of dismissal concerned only the claims against the government actors. Livingston Downs reserved its rights to prove all of its claims against the remaining defendants. Consequently, Livingston Downs properly may maintain that these government actors or the Racing Commission itself provide the plurality of conspirators required for a conspiracy under § 1 of the Sherman Act. The full importance of this fact is that it allows Livingston Downs to allege—as it has—that a larger conspiracy existed and that the other defendants could be held liable insofar as Livingston Downs could prove that they participated in it. Unfortunately for Livingston Downs, this Court has already ruled that the government actors and the Krantzes (et al.), whatever the nature of their relationship, did not enter an antitrust conspiracy.

The August 13, 2001 opinion ruled out the possibility that the Krantzes and the Racing Commission, including its members in their individual capacities, can be liable for together entering a § 1 antitrust conspiracy. This ruling is consistent with the Supreme Court's *Noerr–Pennington* doctrine, upon which the ruling was based, and with its *Parker* doctrine, upon which the Court did not rule because the govern-

ment actors had previously been dismissed. Both these doctrines exempt from antitrust liability any conspiracy between a private actor and a government actor unreasonably to restrain trade on the ground that the Sherman Act should not be interpreted—and was not intended—to extend to acts of petitioning the government. "*Parker* and *Noerr* are complementary expressions of the principle that the antitrust laws regulate business, not politics; the former decision protects the State's acts of governing, and the latter the citizens' participation in government." *Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 374, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). It does not matter that the government and the private business interest entered an agreement that would result in a restraint of trade, even if that agreement, between private actors, would constitute an antitrust conspiracy. *Id.* at 376–77, 111 S.Ct. 1344. Moreover, it does not matter that the agreement is corrupt. "To use unlawful political influence as the test of legality of state regulation undoubtedly vindicates (in a rather blunt way) principles of good government. But the statute we are construing is not directed to that end. Congress has passed other laws aimed at combating corruption in state and local governments." *Id.* at 378–79, 111 S.Ct. 1344 (quoting *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 140, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961)). In fact, under current federal law, local public officials may be—and are—prosecuted for corruption under numerous, scattered provisions of the federal code. Principally, local corruption is prosecuted under the Hobbs Act,[19] the Travel Act,[20] the mail and wire

---

**19.** 18 U.S.C. § 1951. "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so, or

commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or im-

fraud statutes as supplemented by the "intangible right" to "honest services" under § 1346,[21] and the federal bribery[22] and federal program bribery statutes.[23] Prose-

prisoned not more than twenty years or both." § 1951(a).

**20.** 18 U.S.C. § 1952. "Whoever travels in Interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—(1) distribute the proceeds of any unlawful activity; or (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity, and thereafter performs or attempts to perform—(A) an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both; or (B) an act described in paragraph (2) shall be fined under this title, imprisoned for not more than 20 years, or, and if death results shall be imprisoned for any term of years or for life." § 1952(a).

**21.** 18 U.S.C. § 1346. "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." This section answers a conflict over the scope of the mail and wire fraud statutes. The honest services doctrine developed by judicial construction specifically to address breaches of fiduciary duty including local political corruption. The Supreme Court subsequently disapproved the doctrine. *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Then Congress passed § 1346 to abrogate the Supreme Court decision and reinstate the honest services doctrine.

**22.** 18 U.S.C. § 201. "Whoever—(1) directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity with intent—(A) to influence any official act; or (B) to influence such public official or person who has been selected to be a public official to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or (C) to induce such public official or such person who has been selected to be a public official to do or omit to do any act in violation of the lawful duty of such official or person; (2) being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for: (A) being influenced in the performance of any official act; (B) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or (C) being induced to do or omit to do any act in violation of the official duty of such official or person. [ ... ] [S]hall be fined under this title [ ... ] or imprisoned for not more than fifteen years, or both." § 201(b). Though § 201 targets federal officers, it may be used to target local officials who accept federal grant money.

**23.** 18 U.S.C. § 666. "(a) Whoever, if the circumstance described in subsection (b) of this section exists—(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—(i) is valued at $5,000 or more, and (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more; or (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more; shall be fined under this title, imprisoned not more than 10 years, or both. (b) The circumstance referred to in subsection (a) of this section is that the

cutors have worked hard to expand the scope of various of these provisions to target local political corruption, despite strong, but halting, resistance. The Sherman Act does not provide a backdoor to enforcement. It follows, therefore, from the antitrust jurisprudence of the Supreme Court, as well as from this Court's earlier ruling, that there was no antitrust conspiracy between the Krantzes and the Racing Commission or its officials.

■ While this Court did hold in its former ruling that various of the Defendants' petitioning activities were not exempt from the purview of the Sherman Act by virtue of the *Noerr–Pennington* doctrine, those activities were limited to Defendants' purported interference with the Racing Commission acting in its adjudicatory capacity. The ruling held that there is a question of fact whether "the machinery of [the Commission] was effectively closed to [Livingston Downs] and whether the Defendants usurped the Commission's decision-making authority." *Livingston Downs*, 192 F.Supp.2d at 536. None of the other conduct involving the Racing Commission can constitute part of a conspiracy under the antitrust laws. The question remains whether the remaining charge leaves room for claiming complicity between the Krantzes and the Commission under § 1 of the Sherman Act. If so, then it might be claimed that these two actors are the two actors required by that section for an antitrust "contract, combination, [...] or conspiracy." In that case, the other defendants might be implicated to the extent that it can be proved that they took part in that conspiracy.

The Court finds, consistent with its earlier ruling, that the only alleged acts that might be the basis for a conspiracy charge under § 1 cannot support a charge of conspiracy at all, insofar as the government actors are concerned. Even if the *Parker* doctrine allows anticompetitive government acts of any sort to be considered part of a conspiracy under § 1, which this Court doubts, the only charge left after the August 13, 2001 ruling is that the Krantzes used their influence over the Racing Commission members to manipulate its procedures and deny Livingston Downs normal access to its normal process. *See Livingston Downs*, 192 F.Supp.2d at 536. The only question left open is "whether 'the machinery of [the Commission] was effectively closed' to LDRA and whether the Defendants usurped the Commission's decision-making authority." *Id.* These allegations do not implicate the Racing Commission in any form of conspiracy. It is possible that evidence of a (non-antitrust) conspiracy or even evidence of outright bribery would support the contention that the decisions of the Racing Commission were for practical purposes the decisions of the Krantzes. But the heart of the remaining claims is that the Krantzes and their alter egos and agents conspired among themselves to use their control over the Commission to delay and frustrate Livingston Downs' business aspirations. This claim does not assert a conspiracy *with* government actors, but a conspiracy [24] to *use* government actors.

This Court's earlier ruling did not deny summary judgment on these claims because the Court was convinced that Livingston Downs might prove a conspiracy

---

organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." In *Salinas v. United States*,

522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), the Supreme Court held that the prosecution need not prove that the charged briber affected the federal money.

**24.** Though not an *antitrust* conspiracy.

between the Krantzes and the Racing Commission, but because it might prove a conspiracy among the Krantzes and other parties to use the Racing Commission to anticompetitive effect. In that ruling, the Court assumed there was a plurality of conspirators exclusive of the government actors and considered only whether the *Noerr–Pennington* doctrine exempted the various actions complained of from being the basis of antitrust liability. Having determined that the claim that the Krantzes and others manipulated and controlled the Racing Commission in such a way as to usurp its decision-making process could go forward, the Court rejected the motion for summary judgment but left unaddressed the question who conspired to control the Commission. Now the Court is in a position to judge that there is no plurality and that there was no antitrust conspiracy to control the Racing Commission. Instead, if anything, there was a corporate plan to control it implemented by the Krantzes and their agents.

The government actors were the final hope Livingston Downs possessed of proving that there was another party to the alleged conspiracy. In point of fact, the only people whose interests matter for antitrust purposes are the Krantzes. The Krantzes cannot conspire with the government, companies they own wholly, companies in which they have ownership control, corporations they in fact wholly control, or their agents and employees, under § 1 of the Sherman Act. Nor can these agents conspire with each other. Consequently, there were no other actors involved in this scheme, in the eyes of antitrust law, and none of the Defendants can be held liable for engaging in a § 1 conspiracy, regardless how questionable their activities.

**B. Section 2**

Livingston Downs has only explicitly adverted to §§ 1 and 15 of the antitrust laws as the basis for its claims. Original Com-

plaint ¶¶ 221, 223. As discussed above, § 1 criminalizes "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce." Section 15 allows parties injured by antitrust criminal violations to recover damages. So far this litigation has been conducted as if Livingston Downs' antitrust claims fall exclusively under that rubric. *See Livingston Downs*, 192 F.Supp.2d at 528. The Court now notes however, after finding that Livingston Downs has not alleged or cannot prove that there was a plurality of actors behind the alleged antitrust conspiracy, that Livingston Downs' original complaint appears to state a claim under § 2 of the Sherman Act.

The original complaint in this action alleges that "[T]he above described facts demonstrate an attempt thus far successful by the defendants to create a monoply [*sic*] in the horse racing industry within the relevant market, all in violation of federal antitrust law." Original Complaint ¶ 222. Section 2 provides, "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce [ . . . ] shall be deemed guilty of a felony." 15 U.S.C. § 2. Thus it appears that Livingston Downs intends to prove, in the alternative, a monopolization violation. If it can make out this claim and that it suffered damages therefrom, then § 15 would allow recovery. Given that ours is a system of notice pleading, the Court notes the apparent monopolization claim and expressly reserves judgment on the substance of that issue.

■■■ Some § 2 issues, however, should be disposed of at this stage. It is not clear whether by including ¶ 222 of the complaint Livingston Downs intended only to state a claim for attempted monopolization or also a claim for conspiracy to monopolize. To establish an attempt to mo-

nopolize claim, Livingston Downs must prove that the defendant or defendants "(1) had the specific intent to monopolize, (2) took overt acts in furtherance of a scheme to monopolize, and (3) had a dangerous probability of success." *North Mississippi Communications, Inc. v. Jones,* 792 F.2d 1330, 1335 (5th Cir.1986). A conspiracy to monopolize claim requires that Livingston Downs show "(1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce." *Id.* Hence, the burden under either § 2 theory of liability is much greater than the burden under § 1.

■ Despite the differences, however, two things of import to this case do not change. First, the *Noerr–Pennington* and *Parker* immunity doctrines apply to both sections. *See Omni Outdoor,* 499 U.S. at 383, 111 S.Ct. 1344 (rejecting claims under §§ 1 and 2 and stating that "*any* action that qualifies as state action is '*ipso facto* ... exempt from the operation of the antitrust laws'" and "*Parker* and *Noerr* are complementary expressions of the principle that the antitrust laws regulate business, not politics.")(emphasis in original). There is no distinction among the sections of the Sherman Act when these doctrines are implicated. Consequently, the ruling of August 13, 2001 with respect to which activities may provide the basis of an antitrust claim remains effective as to any possible claims under § 2. Under a § 2 conspiracy theory of liability, then, the government actors can no more be co-conspirators than they could under § 1. Similarly, the activities of CCG and its nominal officers cannot be the basis of any § 2 liability.

Second, as under § 1, a § 2 conspiracy claim requires a plurality of actors. *Sur-*

*gical Care Cntr of Hammond, L.C. v. Hospital Serv. Dist. No. 1,* 309 F.3d 836, 840 (5th Cir.2002). In fact, the Fifth Circuit held in *Surgical Care Center* that the same unity of interest analysis that applies to a § 1 conspiracy applies to a § 2 conspiracy claim as well. It wrote:

> St. Luke's contends that North Oaks and Quorum (the company that manages North Oaks) conspired to monopolize the outpatient surgical market. The district court dismissed the conspiracy claim because "as a matter of law, a corporation and its agent [i.e. North Oaks and Quorum] are incapable of conspiracy with one another to violate the antitrust laws." This general rule is correct, and none of the recognized exceptions applies to this case. The district court did not err in dismissing St. Luke's conspiracy claim under § 2 of the Sherman Act.

*Id.* (citing *Siegel Transfer, Inc. v. Carrier Exp., Inc.* 54 F.3d 1125 (rejecting a § 1 conspiracy claim because a corporation and its agents normally have a unity of interests)). Consequently, though Livingston Downs may have stated a claim under § 2, it cannot maintain a § 2 conspiracy claim for the reasons discussed in this ruling, and the ruling of August 13, 2001. It follows that George Boudreaux, Peter Henry, and the Committee to Control Gambling are not liable under § 2. Their acts are protected under the *Noerr–Pennington* doctrine from liability under all the antitrust laws. They cannot be co-conspirators of the Krantzes and so cannot be liable for the culpable acts of those parties as co-conspirators. All claims against these defendants are dismissed.

Only Marie Krantz, Bryan Krantz, Jefferson Downs, Finish Line Management, Fair Grounds, and Larry Bankston (in his individual capacity) remain as possible defendants. Only claims for attempted mo-

nopolization remain against them. The Court will not now consider the substance of the § 2 claims against these defendants because the parties have not addressed them in any form.

### III. Motion for Partial Summary Judgment & Motions *in Limine*

The Defendants, with the exception of Larry Bankston, request that the Court dismiss various damages claims. Livingston Downs seeks damages in the form of compensation for legal fees it incurred defending against various claims brought against it as well as for fees incurred in suits and interventions it brought in response to other actions of the Defendants. Defendants claim that they cannot be held to have caused some of these fees and that, in any event, Livingston Downs has not supplied enough evidence of their damages because their legal invoices are not iternized. The same defendants seek to exclude various kinds of evidence from the much-anticipated trial on the merits.

The Court denies all of these motions without prejudice. It is premature at this stage to reject claims of damages entirely on the basis that the Plaintiffs have not yet provided itemized billing. The standard of proof of the quantum of damages is less taxing than that for the fact of damages. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931). A jury may determine the amount of damages using "a just and reasonable estimate ... based on relevant data." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). Evidence may include "probable and inferential as well as direct and positive proof." *Id.*, and need only avoid "speculation or guesswork." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946). Consequently, if Livingston Downs can prove that some defendants proximately caused it to incur some portion of the legal fees in each case—either by filing the suit in the first place or by intervening and multiplying the pending motions—as well as that these acts suffice for liability under § 2 of the Sherman Act, then they may be able to maintain their claim for damages despite imperfect proof of amount. Should the remaining defendants continue to think their arguments have merit after the parties have developed the § 2 claims and defenses, they may urge the motion again.

The portions of this ruling that concern the RICO and Sherman Act claims substantially reframe this case. It would be inappropriate to exclude evidence when the parties have not yet discussed the elements of the claims that remain in the lawsuit. Consequently, those motions too are denied. In the event that there is reason to make the same motions at a later time, the remaining defendants may do so.

### CONCLUSION

For the reasons discussed above, the motions for summary judgment submitted by Jefferson Downs Corporation (doc. 635), The Committee to Control Gambling (doc. 629), Marie Krantz (doc. 618), Larry Bankston (doc. 650), Peter Henry (doc. 632), and George Boudreaux (doc. 626) are **GRANTED** with respect to all claims asserted against them under RICO. Similarly the motions for summary judgment submitted by the Committee to Control Gambling (doc. 629), Peter Henry (doc. 632), and George Boudreaux (doc. 626) are **GRANTED** with respect to all claims asserted against them under § 1 and § 2 of the Sherman Act. The motions for summary judgment submitted by Jefferson Downs (doc. 635) and Marie Krantz (doc. 618) are **GRANTED** with respect to all claims under § 1 of the Sherman Act, but **DENIED** with respect to any claims un-

der § 2. The Court notes that some defendants have not brought motions for summary judgment on the RICO or Sherman Act claims, or not on all these claims and that the reasons for granting the motions would apply equally to them. In the interest of economy, then, **IT IS FURTHER ORDERED** that any claims asserted against Bryan Krantz, Fair Grounds, Finish Line Management, and Larry Bankston under § 1 of the Sherman Act are **DISMISSED.** For the same reason, all claims against Bryan Krantz, Fair Grounds, and Finish Line Management under the civil RICO statute are **DISMISSED.** The case may proceed under the § 2 attempted monopolization claims against Marie Krantz, Bryan Krantz, Jefferson Downs, Finish Line Management, Fair Grounds, and Larry Bankston.

IT IS FURTHER ORDERED that the motion for partial summary judgment filed by various defendants (doc. 665) on the issue of damages is denied without prejudice. That motion may be raised at a later time if the Plaintiff fails timely to provide itemized attorney bills. It is also ordered that the motions *in limine* filed by the same defendants (docs. 622, 624, 658, and 660) are **DENIED,** though the remaining defendants may reurge those motions once the § 2 claims, if any, are more fully developed.